COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-311-CV
 
 
 
IN 
THE INTEREST OF M.V., A CHILD 
 
 
 
------------
 
FROM 
THE 158TH DISTRICT COURT OF DENTON COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
        Appellant 
Adrienne K. appeals from the trial court’s judgment terminating her parental 
rights to her son, M.V. In one issue, she challenges the legal and factual 
sufficiency of the evidence to support the trial court’s judgment. Because we 
hold that the evidence is legally and factually sufficient to support the 
termination of Adrienne’s parental rights, we affirm the trial court’s 
judgment.
        In 
April 2003, when he was about two months shy of four years old, M.V. was placed 
in foster care. The State filed a petition to terminate four to five months 
later.  Adrienne’s parental rights were terminated after a three-day 
bench trial in September 2004.  The father voluntarily relinquished his 
rights. The petition for termination alleged, and the trial court found, that 
Adrienne knowingly placed or knowingly allowed M.V. to remain in conditions or 
surroundings that endangered his physical or emotional well-being and that she 
engaged in conduct or knowingly placed M.V. with persons who engaged in conduct 
that endangered his physical or emotional well-being.[2] 
The petition also alleged, and the trial court found, that termination was in 
M.V.’s best interest.[3]
        In 
one issue, Adrienne specifically challenges the knowing element of the trial 
court’s finding that she had knowingly placed or allowed the child to remain 
in endangering conditions or surroundings and the finding that she knowingly 
placed M.V. with someone whose conduct endangered him. She also contends that 
nothing supports the finding that her conduct endangered M.V. She does not 
challenge the best interest finding.
        As 
this court explained in In re W.J.H.,
  
Endangerment means to expose to loss or injury, to jeopardize. It can occur 
through both acts and omissions. Neglect can be just as dangerous to the 
child’s emotional and physical health as intentional abuse.
 
Under 
subsection D [of the termination statute], evidence must show that the child’s 
environment is a source of endangerment. In some circumstances, the parent’s 
conduct may create that dangerous environment. Subsection E focuses on the 
parent’s conduct alone, including acts and omissions. While the endangerment 
must be a direct result of the parent’s course of conduct, the conduct does 
not have to be directed toward the child, nor does the child have to suffer 
actual injury for the finding to be upheld. Similarly, the conduct does not have 
to cause a concrete threat of injury to the child. If the evidence shows that 
the parent has engaged in a course of conduct which has the effect of 
endangering the child, then the finding under subsection E may be upheld.[4]
 
 
        The 
trial court heard the following evidence. Adrienne had had prior contact with 
CPS in 1989 when she had left her child S.F. at home alone when he was six 
months old. Adrienne started drinking at age thirteen and drank throughout her 
pregnancy with M.V., including during the weeks that she was hospitalized prior 
to his premature birth.  Born two to three months early, M.V. weighed two 
pounds, thirteen ounces at his birth on July 2, 1999.  Adrienne was placed 
on probation for a DWI deadly conduct incident, her third DWI-related offense, 
that occurred in August 1999 when M.V. was about a month old.  Before 
Adrienne drove that evening, she destroyed “[a]nything that was basically not 
tied down in the kitchen.”  M.V. and his brother were at home at the 
time.  M.V.’s father called the police to report the incident.  
Adrienne was driving when the police found her.  The police were called to 
the residence several times after that.  In February or March of 2000, 
Adrienne was also arrested for shoplifting.
        Adrienne 
testified that in early 2003, before M.V. was removed, she was drinking several 
times a week, at home and away from home, that M.V. was there on occasion, and 
that she was drinking too much when he was in her care.  On one occasion, 
while M.V.’s father waited at their apartment/townhouse complex entrance for a 
ride to work, he saw M.V. come outside.  He testified that Adrienne had put 
M.V. outside, locked the door, and refused to let M.V. back in the home.
        In 
mid-April 2003, a neighbor found a dirty M.V. wandering the grounds of the 
complex, which was located on Frankford Road, a busy thoroughfare in Carrollton, 
Texas. When the neighbor first attempted to return M.V. to his home, no one 
answered the door. The neighbor took M.V. to her home, bathed him, gave him 
another shirt, watched her television programs, and took M.V. back home about 
two hours later. When the neighbor returned M.V., Adrienne was drinking a beer 
and seemed unconcerned about where he had been.  She did not act as if she 
had even noticed his absence.
        On 
April 24, 2003, Adrienne was sleeping in her townhouse when M.V. was again found 
outside unattended. An off-duty police officer saw M.V. walking onto Frankford 
Road from the complex entrance at about 10:00 a.m.  The officer blocked 
three lanes of traffic with his truck, got out and grabbed the child, and put 
him in his truck.  The officer testified that at
 
[t]hat time of day, Frankford Road is a pretty busy road. It's a 40-mile-an-hour 
zone through there and it stays relatively busy. It's one of the major cross 
streets between the tollway and 635. . . . There were cars -- at least two to 
three cars in all three lanes of traffic headed eastbound, maybe more.
 
The 
off-duty officer notified the Carrollton police.
        Officer 
John Stovall responded at approximately 10:15 a.m. M.V. was wearing a T-shirt, 
“soiled diapers that appeared to be full,” no pants, and no shoes. He 
appeared “very unkempt,” “like he hadn’t had a bath in a while.” 
Stovall took the child to the apartment/townhouse complex office. The assistant 
manager described the diaper as “dirty” and “crusty” with feces. The 
office personnel immediately identified M.V. and said that he had been found 
wandering alone in the complex on prior occasions.  Stovall contacted CPS. 
When the assistant manager of the property went to Adrienne’s townhouse, he 
found her with S.F.’s father. Adrienne seemed “a little shocked” that M.V. 
had gotten out and “a little,” but ”[n]ot overly,” concerned about what 
had happened.
        When 
Adrienne came to the complex office to retrieve M.V. from Stovall, “[s]he 
appeared very nonchalant. She had no contact with the child, didn’t try to 
comfort [him] or didn’t seem upset that the child was there in the office or 
had been missing.” When Stovall “told her where the child was found and in 
what condition he was in and that he had been on the busy roadway[,] . . . she 
didn’t seem upset by that at all.”  On that day, Adrienne signed a 
safety plan with CPS in which she agreed to take M.V. to a safer location.
        On 
April 28, 2003, Carrollton police were dispatched to the apartment/townhouse 
complex before 8:00 a.m.  They had received a report that M.V. had been 
found wandering around the complex.  Another resident of the complex 
testified that M.V. had been on Frankford Road again.  The officer returned 
M.V. to Adrienne’s townhouse and woke her up.  Adrienne testified that 
she and M.V. had been sleeping upstairs and that he must have slipped out.  
She did not realize that he was gone until the police arrived at her door with 
M.V. in tow.
        About 
three hours later, a maintenance man discovered M.V. outside unattended 
again.  When the same police officer arrived at the townhouse, he saw a 
cold beer on the table inside and fairly fresh, loose feces in the corner on the 
floor. The high chair tray contained some food that did not appear very 
fresh.  Adrienne told the officers “that she was just trying to sleep.” 
M.V. was removed that day.
        In 
the three months after M.V.'s removal, Adrienne was at Green Oaks Hospital, a 
mental health facility, at least five times.
        At 
the time of trial, Adrienne and her boyfriend had their marriage license and 
were planning to get married the following weekend.  She had met him during 
outpatient alcohol treatment in February of that year.  He was on probation 
for aggravated assault and had a history of alcohol and crack use. On July 15, 
2004, the police were dispatched to their home. The police saw Adrienne drinking 
and saw several empty beer bottles in the trash can.  Adrienne was also 
spotted drinking beer that summer at Ralph’s Pizza. She also showed up to CPS 
counseling drunk on one occasion.  M.V.’s therapist testified that 
Adrienne smelled like alcohol on the day that the trial court discontinued her 
visitation rights.
        M.V. 
was developmentally, educationally, and socially delayed at the time of removal. 
Even though he was almost four years old, he was not potty-trained and still 
wore pull-ups.  He was very thin and small, weighed about 23 pounds, and 
had chronic diarrhea. He wore size18-month clothing. He slept irregularly and 
for only brief periods, hoarded food, and behaved aggressively.  Visitation 
caused him to regress to an infant state, and he expressed a desire not to see 
Adrienne.  The CASA worker did not observe any bond between M.V. and 
Adrienne.
        After 
CPS discontinued Adrienne’s visits ten months before trial, he showed progress 
in development. At the end of the school year before trial, his teacher said 
that he was developmentally appropriate for his age. At the time of trial, he 
was in a regular kindergarten, with the inclusion of a special education teacher 
as needed, and doing fine, although still in speech therapy. He had had to start 
all over on his immunizations because Adrienne could not document which ones he 
had had, but he had caught up on those. He was sleeping through the night and 
eating a balanced diet, and his weight had increased to thirty pounds. His 
social skills had improved, and he had bonded with his foster family. He told 
his therapist that he wanted the judge to leave him in his foster home.  
M.V.’s foster parents want to adopt him.
        Based 
on the evidence before us and the applicable standards of review, we conclude 
that the evidence is legally[5] and factually[6] sufficient to support the trial court’s findings that 
Adrienne knowingly placed or knowingly allowed M.V. to remain in conditions or 
surroundings that endangered his physical or emotional well-being and that 
Adrienne engaged in conduct or knowingly placed M.V. with persons who engaged in 
conduct that endangered his physical or emotional well-being. Even though 
Adrienne does not challenge the evidence supporting the trial court’s best 
interest finding, we also note that the evidence supports that finding.[7]  We therefore hold that the evidence is legally and 
factually sufficient to support the trial court’s judgment terminating 
Adrienne’s parental rights. Because of our holding, we do not reach her 
subissue regarding the evidence supporting her noncompliance with the 
court-ordered service plan.[8]
        We 
overrule Adrienne’s sole issue and affirm the trial court’s judgment.
   
   
                                                                  LEE 
ANN DAUPHINOT
                                                                  JUSTICE
  
  
 
PANEL 
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
 
DELIVERED: 
August 4, 2005

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
See Tex. Fam. Code Ann. § 
161.001(1)(D), (E) (Vernon 2002).
3.  
See id. § 161.001(2).
4.  
In re W.J.H., 111 S.W.3d 707, 715-16 (Tex. App.—Fort Worth 2003, pet. 
denied) (citations omitted).
5.  
See In re J.F.C., 96 S.W.3d 256, 265-66 (Tex. 2002).
6.  
See In re C.H., 89 S.W.3d 17, 25, 28 (Tex. 2002).
7.  
See J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25, 27, 28; Holley 
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).
8.  
See Tex. R. App. P. 47.1; W.J.H., 
111 S.W.3d at 715.